John Allen BURNETT *v.* STATE of Arkansas

CR 89-24                                          776 S.W.2d 327

Supreme Court of Arkansas
Opinion delivered September 11, 1989

554

*Q. Byrum Hurst, Jr.*, for appellant.

*Steve Clark*, Att'y Gen., by: *J. Denhammcclendon*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. John Allen Burnett, the appellant, was convicted of first degree murder and sentenced to life imprisonment for killing his wife, Cherie Burnett. He raised seven points of appeal, two of which we have combined for discussion. We find no merit in any of the points raised, and thus the conviction is affirmed.

The Burnetts shared a small apartment with Rod Pennington and Johnnie Loyd. On the evening of August 12, 1988, John Burnett left the apartment to be with friends. Cherie Burnett later left with a man named Stone. There was testimony that she was drinking whisky that evening. Stone testified that he and Cherie looked for the home of a person who was supposedly having a party but did not find it. He said he kissed Cherie and partially disrobed her, but she passed out and they did not engage in sexual intercourse. He took her back to her apartment and carried her inside.

In a statement to the police, Rod Pennington stated that when Stone brought Cherie back to the apartment she had numerous bruises. At the trial he testified that was not true but she did have "hickeys" on her neck. Johnnie Loyd testified that her original statement to the police was true but that it had left out the fact that John and Cherie had had a fight later that morning after John had returned with a friend, Danny Graham.

Pennington and Loyd testified it was not uncommon for John and Cherie to fight. They were awakened by the fight that night, or early morning, but both testified they did not see John hit Cherie with his fist. Rather, they said, he was "slapping" her. Johnnie admitted that John kicked Cherie and said he would kill her and that, although he was mad, she did not think he meant it. Johnnie also testified that John also threatened to kill her and Rod that night, and both testified to being afraid of John.

Graham was present during the beating. He described the fight too, saying that, after he and John returned to the apartment at 3:30 or 4:00 a.m., John awakened Cherie. John and Cherie were standing up hitting each other, and the fight moved through

the three rooms of the apartment as well as outside. John was moving Cherie about, holding her by her arm and by her hair. It was a fistfight part of the time. When they were in the bedroom, John was on top of her hitting her, and she was "balled up" on the bed. At one point, "John flipped a chair over on Cherie and was mashing her with it." During some of the protracted fighting Graham said he was lying on the couch trying not to watch, but he could hear Burnett hollering, "I'll kill you, bitch."

The following afternoon it appeared that Cherie was not breathing well, and John and others took her to a hospital where she was found to be in a coma from which she did not recover. Both the treating physician and the pathologist who conducted the autopsy testified that there were numerous cuts and bruises over Cherie's entire body.

The autopsy showed an extensive hemorrhage around Cherie's voice box which compressed the wind pipe and the voice box. That caused the brain to suffer from lack of oxygen. The brain was also compressed by an accumulation of fluids. In the opinion of the pathologist she died from all of the effects described, the beating, attempted strangulation, and edema of the brain.

John testified that when he and Graham returned to the apartment they found Cherie passed out on a mattress on the floor, partially disrobed, and with numerous bruises on her body. He said he shook her to try to awaken her to find out who had injured her and that she called him the names of other men and accused several persons of raping her. He said he became very emotional and slapped her to awaken her, but he denied having fought Cherie. He went with her to the hospital and attempted to resuscitate her on the way.

Other facts will be presented as necessary for discussion of the points of appeal.

### 1. Premeditation and deliberation

Burnett contends there is insufficient evidence to establish premeditation and deliberation which are elements of the offense of first degree murder. Ark. Code Ann. § 5-10-102(a)(2) (Supp. 1987). He argues that nothing in the evidence presented showed that he wanted her to die. To the contrary, there is evidence that

he said he would kill her during the time he was administering a brutal beating.

The state asks us to find there was circumstantial evidence of premeditation and deliberation based on "the type of weapon used, the manner of its use, and location of the wounds," citing *Parker* v. *State*, 290 Ark. 158, 717 S.W.2d 800 (1986), and *Williams* v. *State*, 289 Ark. 69, 709 S.W.2d 80 (1986). We need not go that far in view of the direct evidence of Burnett's intent which consists of the statements he made during the fight coupled with the serious injuries the jury believed he inflicted.

### 2. *Previous conviction; enhancement*

John Burnett testified on direct examination that he had previously been convicted of armed robbery. He did so presumably because he knew the prosecution could bring it up as a way of questioning his credibility. *Coleman* v. *State*, 256 Ark. 665, 509 S.W.2d 824 (1974). There is no merit in the argument that the prosecutor mentioned the conviction during the phase of the trial conducted to determine guilt or innocence, as he did not do so until after Burnett had testified about it.

Burnett also argues he was not allowed to enter a plea to the charge of enhancement. In *Atkins* v. *State*, 287 Ark. 445, 701 S.W.2d 109 (1985), we held that no such plea is required.

### 3. *Change of venue*

Burnett contends that the publicity about the killing was so pervasive that his motion for change of venue should have been granted. He presented two witnesses who testified about widespread gossip about the case and that they had heard people say he was guilty. Except for one of them naming her sister, neither witness could, or would, identify the persons who had made the statements. Other witnesses seemed to acknowledge that there was widespread discussion of the case but felt Burnett could receive a fair trial. He also introduced into evidence several newspaper articles about the incident.

Burnett's burden was that of showing an abuse of discretion in the failure of the trial court to grant his motion. *Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986); *Kirkendall* v. *State*, 265 Ark. 853, 581 S.W.2d 341 (1979). Although we

were not furnished an appellant's abstract of the voir dire, we have examined the record and the abbreviated abstract presented by the state, and we have determined that the record shows Burnett got a fair jury. Some of the jurors had read or heard about the case, but none of those selected said he or she could not give him a fair trial under the law. *See Perry v. State*, 277 Ark. 357, 642 S.W.2d 865 (1982). We have held that it is not necessary that jurors all have no knowledge whatever of the case to be decided. *Swindler v. State*, 267 Ark. 418, 592 S.W.2d 91 (1979). We find no abuse of discretion.

### 4. Photographs

### a. Of the victim

■ Burnett contends the photographs of Cherie depicting her numerous injuries should not have been admitted because there was no evidence that the injuries depicted contributed to her death and thus the photographs only confused the jury. The state pathologist testified that Cherie died from the effects of all these various injuries. Clearly they were relevant, and there is no argument that they were duplicative. *See Berry v. State, supra.*

### b. Of the crime scene

The argument here is that the photographs made in the apartment, which showed blood stains, a door facing partially torn off, and an indentation in the wall, were made on September 1, 1988, and no evidence showing that the scene had been secured between August 13 and September 1 was presented. The officer who took the pictures had not been at the apartment on August 13 and thus could not testify whether the items photographed in the apartment appeared then as it did in the photographs.

Burnett's counsel objected, and the court acknowledged the objection and ruled that the officer who took the pictures could identify them but that they would only be introduced into evidence subsequent to other testimony overcoming the objection, presumably by proving the photographs accurately depicted the scene on August 13, 1988.

■ Another police officer who had been at the scene on August 13, 1988, testified that there were blood and glass on the floor on August 13. He could not, however, say for certain that the

pictures, with a few exceptions, accurately depicted the condition, as of August 13, of the items shown in the apartment. One exception was a picture of a hole made in the sheetrock covering the wall. Another exception was a picture of a chair which the officer testified had been in the apartment that night. These photographs were properly admitted because there was testimony showing they depicted items or places in the apartment the same as they were the night the incident occurred. *Riggan* v. *Langley*, 238 Ark. 849, 383 S.W.2d 661 (1964); *Wheeler* v. *Delco*, 237 Ark. 55, 371 S.W.2d 130 (1963).

■ The only other photograph admitted was one showing the general layout of the apartment. It was admitted on the testimony of the officer who took it. Given the unlikeliness that the general layout would have changed in the two week period between August 13 and September 1, it was not error to admit the photograph.

■ We do not find that the prejudicial effect of these photographs outweighed their probative value. That decision lies within the sound discretion of the trial court. *Berry* v. *State, supra; Hallman* v. *State*, 288 Ark. 448, 706 S.W.2d 381 (1986). The trial court carefully weeded out the duplicative pictures, and we find no abuse of discretion in the ones admitted.

### 5. Prosecutor's remark

Burnett testified during cross-examination that he was trying to help Cherie the day of the incident. The prosecutor then said: "Helped her right into the morgue." No objection was made, but the court immediately admonished the jury to disregard the statement of the prosecutor. At that point defense counsel moved for a mistrial. The motion was denied.

■ We find no error. The statement, whether or not it was improper, was not of such magnitude that we must find the court abused its discretion in denying the motion. An admonition to the jury, such as the one given here, can cure whatever effect such a statement may have had. *Foster* v. *State*, 294 Ark. 146, 741 S.W.2d 251 (1987). In such a situation, a mistrial should be granted only if it appears that justice cannot be achieved by the continuation of the trial. *Foster* v. *State, supra; Novak* v. *State*, 287 Ark. 271, 698 S.W.2d 499 (1985). We find no error.

### 6. Motion in limine

It is contended that the trial court should have granted Burnett's motion in limine suppressing a statement made by Danny Graham to police officers. The ground stated is that defense counsel was not notified of the taking of the statement.

■ We need not decide the point. Burnett's brief concedes that the court made no ruling on the motion. It was Burnett's burden to obtain such a ruling. *Wood* v. *State*, 276 Ark. 346, 635 S.W.2d 224 (1982). No objection was made to the testimony of Graham, and the motion was not renewed or later pursued.

### 7. Rule 11(f)

In accordance with Arkansas Supreme Court and Court of Appeals Rule 11(f), the state has abstracted all objections and motions decided adversely to Burnett. We have reviewed them and the record, and we find no prejudicial error.

Affirmed.